# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,     )
                     )
            Plaintiff,     )    **CRIMINAL ACTION**
                     )
v.                         )    No. 11-10019-03
                     )
BRYCE LINDGREN,          )
                     )
            Defendant.     )
_____ )

## MEMORANDUM AND ORDER

This matter is before the court on the following:

Defendant's Motion and Supplemental Motion to Suppress Statements (Docs. 85, 99), and Government's response (Doc. 112);

Defendant's Motion to Suppress Search (Doc. 86)and Quash Arrest and Suppress Evidence (Doc. 101), and Government's response (Doc. 111); and

Defendant's Motion in Limine to Preclude Co-Conspirator Hearsay Statements (Doc. 105) and Government's response (Doc. 109).[1]

The court held evidentiary hearings on the motions on December 12 and 14, 2012, and heard oral arguments on December 18, 2012.

## I Facts

On the morning of April 8, 2008, agents in Wichita from the DEA, FBI, ATF and Sedgwick County Sheriff's Department were preparing to execute three related search warrants. The warrants all arose out of

---

[1] Defendant withdrew his motion requesting a James hearing at the December 18, 2012 hearing. Additionally, defendant's Motion to Suppress Wiretap Evidence (Doc. 104) was orally withdrawn by defense counsel at the December 3, 2012 hearing. Also on December 3rd, the court determined defendant's Motion in Limine to exclude prior bad acts (Doc. 103) was moot in view of the Government's representation (Doc. 108) that it would not use the challenged evidence in its case-in-chief.

a joint investigation into possible drug dealing, money laundering and bank fraud by a group of individuals. Defendant Lindgren was one of the suspects, although his residence at 3918 N. Lakecrest Circle, Wichita, was not one of the three houses for which agents had search warrants. Defendant and his wife Michelle Lindgren lived together at that residence.

The agents discussed their plan of execution at a briefing sometime before the morning of April 8th. There was some suggestion that they should apply for a warrant to search defendant's residence, but the suggestion was rejected, and it was made clear at the briefing that there was no such warrant. The plan was for agents to execute or partially execute the warrants on the other houses and then make contact with defendant to try to get his cooperation and consent for a search. It was known that defendant had previously cooperated with DEA agents during a drug investigation in 2003.

Entry into the Lindgren residence.

Execution of the search warrants began as planned on the morning of April 8th. After executing at least two of the warrants, several agents were sent to the Lindgren residence some time between 3:00 and 3:30 p.m. There was directly contradictory testimony about the agents' initial entry into the house. Taking into account the various testimony and the credibility of the witnesses, the court finds it likely that a number of armed agents, some dressed in "raid gear," were massed on the front porch of the Lindgren residence when Michelle Lindgren opened the front door. Some of the agents likely had their weapons drawn and pointed at her. At least one agent carried a rifle. Some of the agents had been assigned to "entry teams" that had

-2-

executed one or more of the three other search warrants. They ordered Michelle Lindgren out of the house and entered the residence, without a warrant and without consent,[2] to do a sweep. At least some of the agents believed they had been sent there to secure the residence against possible destruction of evidence while a search warrant was obtained. (E.g. Tr. at 50, 58, 75). But there was no plan or attempt at that time to get a warrant for the Lindgren residence.[3]

When the agents entered the house, they went through each room to see if anyone else was there. No one was. Notwithstanding certain testimony to the contrary, the court finds no credible evidence that the agents initially engaged in a more extensive search than merely looking for occupants. There were a number of agents in the house during the sweep. The evidence suggests that several agents remained in the house with Mrs. Lindgren after the initial sweep was completed.

---

[2] One agent testified that when the door was opened, the agents introduced themselves and Michelle Lindgren "invited us in." That testimony goes against the weight of the evidence, including the testimony of other agents who said they did not obtain her consent. (Tr. at 59, 80). Given the extensive passage of time since this incident took place, as well as the number of searches that took place the same day, it may not be surprising that the agents' testimony conflicted on points both large and small. The agents' ability to recall was certainly hampered by the lack of any contemporaneous written report describing the entry into the house or the seizure of the defendant.

[3] Any belief by agents in the possible destruction of evidence at the time of initial entry was not fully explained at the hearing. One agent testified that "we believed that one or both of the homeowners was there or were on their way there and had learned of our – the execution of our previous search warrants. So we didn't want them to get to their residence and begin destroying evidence before we had time to get a search warrant written and signed." (Tr. at 51). The defendant conceded on cross-examination that he had seen a number of cars the morning of April 8 at the nearby Serratos house and that he couldn't recall but "may have" called Serratos to warn him and tell him not to go home. (Tr. at 530-31).

The agents probably handcuffed Michelle Lindgren at some point during the initial encounter. They likely took the handcuffs off shortly after their initial sweep through the residence. At some point they put the Lindgrens' two dogs in a room where they were out of the way. Following the sweep of the residence, the agents had Michelle Lindgren sit on a couch in the living room and asked where her husband was. She told them he was at the post office and would be back soon. She was undoubtedly upset and in shock at that point over the agents' uninvited entry into the house.

Shortly thereafter, just before 3:30 p.m., the defendant pulled into the driveway of the residence. As he did so, a number of agents ran out and surrounded his car. With weapons drawn, they ordered him out of the car and made him get on the ground. No evidence was presented at the hearing to show that the agents had any reasonable fear for their safety or any reasonable belief that the defendant was armed or violent. Nor was there any evidence that these agents had been directed to arrest the defendant or to take him into custody. The agents handcuffed defendant and walked him into the house, sitting him on the love seat next to his wife.[4]

At the suppression hearing, DEA Special Agent Greg Anderson

---

[4] The Government presented the testimony of agents who may have observed but did not participate in the initial encounter with defendant. One agent described a rather benign meeting where DEA agents "contacted" defendant, with no recollection on the agent's part of defendant being put on the ground or handcuffed. Another agent suggested a similar scenario, although he could not remember any details and was clearly confused as to the sequence of events. (He estimated defendant first arrived at the house close to 8:00 p.m. (Tr. at 223)). The testimony of an apparently disinterested neighbor and the contemporaneous record of a 911 call, however, suggest the defendant was seized in the manner described above.

testified he believed there was probable cause to arrest defendant at the time of the initial encounter. When asked to explain his belief, he said it was based on wiretaps, surveillance and statements from coconspirators.[5] He said there was a wiretap authorization for defendant's phone, and that he and other investigators had heard phone conversations to or from the defendant that led Anderson to believe defendant was engaged in drug trafficking activities in Wichita. He further said a cooperator had told investigators prior to April 8 that defendant was involved in trafficking cocaine, marijuana and ecstacy. He said he believed before April 8 that the cooperator's statements were credible because there was "other corroborating information." (Tr. at 272-74). Anderson also testified that defendant had been a suspect in a drug investigation in 2003 but was not charged because he had agreed to cooperate with DEA task force officer Brad Carey.

An application for search warrant completed later in the day on April 8, 2008, by FBI Agent Eric Brantley, asserted that a wiretap for defendant's phone had been judicially approved in November of 2007. The application stated that on November 26, 2007, defendant made a phone call to Heath Marx and asked him to buy 4 x 8 foot pieces of PVC pipe and connectors in quantities and measurements that "are consistent with an indoor, hydroponic marijuana grow."[6]

---

[5] The question put to the agent was "not asking for necessarily the specifics, but what type of evidence was your belief based on?" (Tr. 272).

[6] The evidence at the suppression hearing established that shortly before April 8, 2008, agents obtained search warrants for three other residences believed to contain evidence of crimes relating to this investigation. But the applications in support of those warrants were not summarized or otherwise introduced into evidence at the suppression hearing. The court therefore does not consider them

The agents allowed Michelle Lindgren to call her mother-in-law, Dr. Naoma Crisp-Lindgren, to ask if Crisp-Lindgren could come pick up the Lindgren's dogs. The dogs were agitated by all the commotion at the house. Records show this call took place at 3:39 p.m.

Wichita police officer Von Hardin was dispatched to the Lindgren residence at 3:28, and he arrived there at 3:42 p.m. Agents at the scene had Hardin transport the defendant to the DEA office at 1919 North Amidon. Hardin arrived at the DEA office, with defendant in tow, at about 4:00 p.m.

Crisp-Lindgren came to the Lindgren house at some point and picked up the dogs from Michelle. Michelle brought the dogs out of the house; she was accompanied by two agents. Michelle and Crisp-Lindgren had a brief conversation before Michelle went back in the house. Crisp-Lindgren wanted to go in as well and talk to her son,[7] but an agent standing outside told her she could not go in. Crisp-Lindgren

---

as evidence for purposes of the instant motions.

The court notes that these other applications, which are public records available in the court's electronic filing system, contained far more information than the warrant application on the Lindgren house. For example, in Case No. 08-m-6063-KMH, in which a warrant was obtained to search 8202 W. Havenhurst, Agent Anderson's application dated 4/3/08 spelled out the relationship between suspects Alcala, Serratos, and Lindgren. It also contained a multitude of other information including wiretap excerpts in support of the agent's belief that Alcala was purchasing the residence at 8202 W. Havenhurst from Lindgren and had delivered cocaine to Lindgren as a down payment on the house. Similarly, in Case No. 08-m-6064-KMH, the application (4/3/08) detailed facts reasonably supporting agents' belief that defendant, Serratos, Marx, and McAninch had set up an indoor marijuana-growing operation at the house at 8406 W. Palmetto.

[7] It is not clear that defendant was still at the residence when Crisp-Lindgren arrived. Crisp-Lindgren received the call to come over at 3:39 p.m., and she testified that it took her about 20 minutes to get there. Records indicate defendant was transported from the house at around 3:45 p.m. and arrived at the DEA office at about 4:00 p.m.

testified she had asked Michelle whether defendant had an attorney, and Michelle said he had asked for one but they wouldn't let him have one. That testimony is not entirely credible, although it is clear that at some point on April 8 Crisp-Lindgren and Mrs. Lindgren discussed getting an attorney for defendant. Crisp-Lindgren clearly felt defendant needed an attorney. The record shows there were several phone calls between Crisp-Lindgren and Michelle that afternoon and evening. Crisp-Lindgren placed a call to attorney Charlie O'Hara's office at 7:24 p.m. that evening. But considering all of the evidence, including the testimony of defendant's mother and wife, the defendant himself, and the various agents who testified, the court finds no credible evidence that defendant ever told the agents that he wanted to speak to an attorney.

Bryce Lindgren testified that agents pulled him into the office inside his residence and asked him "where are all the fake pay stubs and W-2s and all these documents that I supposedly falsified." On balance the evidence does not support the credibility of that assertion. Nor does the evidence support defendant's claim that immediately upon being confronted by agents he told them he needed an attorney. Moreover, the evidence shows that agents did not begin searching the residence for documents prior to defendant being transported to the DEA office. As noted above, WPD Officer Hardin likely picked up defendant at the residence around 3:45 p.m. and delivered him to the DEA office at 4:00 p.m.

Michelle Lindgren was also transported by an officer to the DEA office shortly after defendant was taken there. There is no evidence that she was told why she was being transported or, for that matter,

why she was transported in the first place. She was likely handcuffed. When they arrived at the DEA office, the agent took off her handcuffs and had her sit in the front lobby area while they interviewed her husband.

Some agents apparently waited at the residence while the Lindgrens were at the DEA office. Some of the agents may have remained inside the residence.

Defendant was taken to an interview room at the DEA. DEA Agent Brad Carey – with whom defendant was familiar – joined him a short time later, as did DEA Agent Jack Smalley. The evidence suggests defendant had good relationship with Carey and was willing to cooperate with him. When defendant asked Carey about the situation, Carey explained that he first had to inform defendant of his rights. Carey started filling out a "Your Rights" form (Govt. Exh. 4) at 4:37 p.m.  The form contains a straightforward explanation of Miranda rights.

DEA Agent Greg Anderson and DEA task force officer David Heim had just interviewed a cooperating witness in the investigation when they were informed defendant and his wife were at the DEA office.  The agents returned to the office and went to the interview room where defendant and agent Carey were. The evidence is clear as to the exact sequence of events, but it supports a finding that at least one (and probably more) of the agents reviewed the "Your Rights" form with defendant prior to his execution of the form. The evidence is clear that defendant fully understood his rights and voluntarily agreed to talk to the agents. (E.g., Tr. at 279-80). Defendant executed the rights form, which bears his signature and the signatures of agents

Anderson and Heim.

Defendant testified that the agents told him at that point he was being investigated for drugs, mortgage fraud and money laundering. (Tr. at 491). Brad Carey presented defendant with a consent to search form and asked if he would be willing to allow a search of his home. The evidence shows defendant was willing to execute the form, and did so, knowing that he was choosing to let the agents search the house. (Govt. Exh. 3). Carey may have expressed particular interest in searching the files in defendant's home office – given the allegations of mortgage fraud – but his request for consent was not limited to that area, nor was defendant's grant of consent limited in any way. Defendant's testimony that he only granted consent to search his home office is rejected as not credible. The consent form itself shows the place to be searched was described simply as "3918 N. Lakecrest Cir".[8]

After getting defendant's signature on the consent-to-search form, Anderson and Carey approached Michelle Lindgren in the lobby. Anderson testified he told her Bryce had signed a form allowing a search of their home and that they would like to have her consent as well. Michelle Lindgren testified that they told her Bryce had executed the form and that he wanted her to sign it. She testified that she signed it because "it really didn't matter, they'd [already]

---

[8] Defendant's credibility at the suppression hearing was lacking in most respects. Particularly dubious were his assertions that he repeatedly asked to speak to an attorney, that he did not understand his Miranda rights (despite being a college graduate and having been informed of his rights on prior occasions), that the Government somehow altered his consent-to-search form after he signed it, that the agents physically abused him during the interview, and that he never made the multitude of statements attributed to him by Agent Heim in Heim's written report. (See Govt. Exh. 16).

searched the whole house...." (Tr. at 427).

Shortly after the Lindgrens signed a consent-to-search form, they were transported back to the residence in a car with agents Anderson and Heim so that the Lindgrens could be present during the search.[9] Defendant had agreed to talk to them, and Anderson and Heim wanted to interview defendant about items found during the search. They arrived back at the house shortly after 5:30 p.m. When they entered the house, defendant showed the agents where he had several firearms stored.

Numerous agents were brought into the house for the search. When several FBI agents showed up, including Eric Brantley, defendant became agitated. Although defendant was comfortable working with the DEA, he was surprised to learn that the FBI was going to be searching his files. Because defendant was upset, the agents contacted DEA's Brad Carey to come to the house and talk to defendant, because they knew defendant was comfortable with Carey. When Carey arrived,[10] defendant immediately approached him and expressed concern about the FBI's involvement. Carey told defendant that it was the FBI's case, not his, and that defendant would have to deal with the FBI. Defendant asked Carey at that point whether Carey thought defendant should get an attorney. According to Carey, he responded, "You're a big boy" and "that's up to you." Carey testified defendant never asked to speak to

---

[9] Agent Anderson testified that while still at the DEA office, he recommended to his supervisor that they go ahead and obtain a search warrant, but his recommendation was denied.

[10] There was conflicting evidence as to whether Carey was called to the residence before or after the Lindgrens were taken to the DEA office. The weight of the evidence suggests it was after.

or consult with an attorney.

A short time after agents began searching defendant's home office and his files, defendant conveyed to Anderson or Heim that they didn't need to go through all of the files. He said he could tell them what files to look at if they would tell him what transactions they were interested in. The evidence suggests Anderson was not pleased at what he viewed as defendant's attempt to limit what was previously an unqualified consent. Anderson told defendant that he was going to get a search warrant. Defendant protested, saying there was no need for that, but Anderson believed defendant was "waffling" on consent and that the better course was to go ahead and get a warrant. Despite defendant's protestations, Anderson and Heim directed the other agents to cease their search. Most of the agents left the residence at that point to wait while a search warrant was sought. A few agents remained inside the house to prevent any tampering with evidence. Anderson and Heim remained in the residence and continued to talk to defendant. Despite the dispute over consent, defendant remained willing to talk to the agents and to answer questions.

FBI Agent Brantley prepared an application for a search warrant on defendant's residence. A warrant was issued by a U.S. Magistrate Judge at 7:28 p.m. (Govt. Exh. 5). Brantley notified agents by phone of the issuance of the search warrant. Agents then resumed searching the house for the items specified in the warrant, including mortgage or loan records, bank statements, computer files containing those items, and controlled substances. Agents found various evidentiary items in the course of their searches that evening, including magazines about growing or manufacturing controlled substances, social

security cards for two females found in a bag containing "MDMA," a cutting agent for methamphetamine, suspected steroids found in a hidden drawer, bank deposit slips, and mortgage records.

Agents Anderson and Heim interviewed defendant in defendant's home office during the search. There were likely several discussions over the course of the evening. During the interview defendant made a number of admissions, including: that he had received cocaine from Francisco Serratos as partial down payment for the sale of the residence at 8202 W. Havenhurst to Luis Alcala; that he had subsequently sold the cocaine; and that he had agreed with Serratos and others to set up an indoor marijuana-growing operation in a hidden room at 8406 W. Palmetto. The interview with defendant continued on and off over a period of several hours.

Michelle Lindgren called her sister, Raquel Chavez, asking if Raquel could come pick her up. That call was placed at 10:29 p.m. (Tr. at 389-90). Raquel lived just two or three blocks away. Raquel's husband, Jimmy Chavez, came by and picked up Michelle and took her to the Chavez house. Michelle waited there until sometime after 11:00 p.m. when agents completed their search at the Lindgren house.

## II. ANALYSIS

Defendant contends officers unlawfully arrested him without probable cause and without a warrant; that they unlawfully entered and searched the residence; that any consent to search was tainted by the unlawful arrest and detention; and finally, that the affidavit used to obtain a search warrant failed to establish probable cause.

For its part the Government more or less concedes the agents unlawfully entered the house and detained Mrs. Lindgren without cause.

But it contends there was probable cause to arrest the defendant. It further argues the Lindgrens voluntarily consented to a search of the residence and that their consent was not tainted by any unlawful search or seizure. Once defendant expressed reservations about the search, the Government contends the search was halted while a warrant was obtained. It argues the Magistrate Judge who issued the search warrant had a substantial basis for finding probable cause. The Government contends all of the evidence found in the house was free from taint of any illegality and was, or inevitably would have been, found by lawful means. It further argues that defendant's statements to the agents were voluntarily made after a valid waiver of <u>Miranda</u> rights and are free from any taint.

**A. Initial entry into the residence**. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. IV.

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980) (citation omitted). It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. <u>Payton</u>, 445 U.S. at 586. That rule is subject only to a few carefully established exceptions. <u>United States v. Jones</u>, ___ F.3d ___, 2012 WL 6582319, *14 (10th Cir., Dec. 18, 2012).

One of the exceptions to the warrant requirement is a voluntary consent to enter or search a residence. <u>Payton</u>, 2012 WL 6582319, *14. The evidence here fails to establish that the agents were given consent to enter the Lindgren residence. To the contrary, the clear weight of the evidence shows agents entered the house through an unwarranted show of force.

Another exception to the warrant requirement allows police to enter a residence when such entry is required to prevent the imminent destruction of evidence. <u>United States v. Hendrix</u>, 664 F.3d 1334, 1338 (10th Cir. 2011). The Government does not argue – and has not shown – that the prerequisites for such an entry existed in this case. <u>See</u> <u>United States v. Aquino</u>, 836 F.2d 1268, 1272 (10th Cir. 1988) (setting forth required elements). Nor does the evidence support a finding that any other exigent circumstances justified the non-consensual entry into the Lindgren house. <u>See</u> <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006) (discussing exigent circumstances that may justify warrantless entry into home). In sum, the court finds that the officers' entry into the home violated the defendant's Fourth Amendment right to be free from unreasonable searches and seizures.

**B. Seizure of defendant and Michelle Lindgren**.

The agents' detention of the defendant clearly amounted to a seizure under the Fourth Amendment. In fact, the Government conceded at oral argument that the detention exceeded the limits of a <u>Terry</u> stop and amounted to a formal arrest. That concession was fully justified by evidence showing that defendant was detained at gunpoint, placed on the ground and handcuffed, and then transported by officers to the DEA office. Such forceful techniques generally exceed the scope

of an investigative detention. <u>Morris v. Noe</u>, 672 F.3d 1185, 1192 (10th Cir. 2012). And that is clearly the case where, as here, there was no showing that the agents had any reasonable fear for their safety at the time of defendant's seizure or that other circumstances made the level of force employed reasonable for a <u>Terry</u> stop. <u>United States v. Salas-Garcia</u>, 698 F.3d 1242, 1249 (10th Cir. 2012) (use of such forceful techniques requires government to show action taken was appropriate). Under the circumstances the defendant's initial detention amounted to an arrest requiring probable cause. <u>Cf</u>. <u>United States v. Melendez-Garcia</u>, 28 F.3d 1046, 1053 (10th Cir. 1994) ("Because the specific nature of this stop was not justified under the <u>Terry</u> doctrine, we must treat it as an arrest, requiring probable cause."); <u>Kaupp v. Texas</u>, 538 U.S. 626, 630 (2003) ("we have never 'sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes ... absent probable cause or judicial authorization.'").

The evidence presented at the hearing also failed to show that the seizure of the defendant was legally justified at its inception. No credible showing was made that the agents who initially took the defendant into custody were themselves aware of facts giving rise to probable cause to believe that the defendant had committed or was committing an offense. Nor were these agents directed to take defendant into custody by other officers who had the requisite level of probable cause. <u>Cf</u>. <u>United States v. Whitley</u>, 680 F.3d 1227, 1234 (10th Cir. 2012)(arrest or stop is justified under vertical collective knowledge doctrine when officer having probable cause or reasonable

suspicion instructs another officer to seize suspect). On the contrary, they had been directed by Agent Anderson or others to simply approach the defendant and seek his voluntary cooperation.

The Government argues the defendant's arrest was supported by probable cause. This argument fails for two reasons. First, the evidence presented did not include sufficient facts to show that at the time of the arrest Agent Anderson or others had reasonable grounds to believe the defendant had committed an offense. Second, even if the court were to find that Agent Anderson's knowledge at the time of arrest did rise to the level of probable cause, the evidence failed to show a legal basis for imputing Anderson's knowledge to the officers who actually arrested the defendant.

Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested. <u>United States v. Martin</u>, 613 F.3d 1295, 1302 (10th Cir. 2010). Probable cause is a "fluid concept" that is based on the totality of circumstances. It takes into account the practical considerations of everyday life upon which reasonable and prudent persons – not legal technicians – act. <u>Illinois v. Gates</u>, 462 U.S. at 238.

The court concludes that Agent Anderson's testimony at the suppression hearing, which the Government cites as the basis of probable cause, failed to meet that standard. His testimony was essentially limited to identifying the <u>types</u> of information that supported his belief of probable cause. He did not articulate any specific facts reasonably supporting a belief that the defendant had committed any particular crime. While the court found Anderson's

testimony generally credible, simply identifying the types of information relied upon does not meet the Government's burden. Anderson said agents had "a cooperator" who told them defendant was involved in trafficking cocaine, marijuana and ecstacy, but offered no information about the cooperator's veracity, reliability, or basis of knowledge, other that asserting that the informant's statements were credible "because there was other corroborating information...." Tr. at 271-73. He offered no evidence or suggestion of any particular drug transaction. There may well have been "other corroborating information" that tended to support the unnamed informant's reliability, but <u>some</u> factual basis for that conclusion must be offered to meet the government's burden. <u>See</u> <u>e.g.</u>, <u>Illinois v. Gates</u>, 462 U.S. 213, 239 (1983) ("an officer's statement that 'affiants have received reliable information from a credible person and believe that heroin is stored in a home'" fails to establish probable cause because it "is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" and because the judge's action "cannot be a mere ratification of the bare conclusions of others"); <u>United States v. Hendrix</u>, 664 F.3d 1334, 1338 (10th Cir. 2011) ("the court makes a probable cause determination based on the totality of the circumstances, including [an] informant's veracity, reliability, and basis of knowledge").

Agent Anderson testified he had listened to wiretapped calls that led him to believe defendant was involved in drug trafficking, but he did not recount any such conversations or summarize anything that was said on those calls. The Government need not come forward with any great detail to show that such a belief was reasonable. Even

a cursory summary by the agent of what was said on those calls may be enough. But the Government must provide the court with some factual basis to permit a finding that the agent's conclusion about drug trafficking was a reasonable one. Beck v. State of Ohio, 379 U.S. 89, 97 (1964) ("when the constitutional validity of that arrest was challenged, it was incumbent on the prosecution to show with considerable more specificity than was shown in this case what the informer actually said, and why the officer thought the information was credible."). Without that information, a finding of probable cause by the court would be "a mere ratification of the bare conclusions of others," something the law does not allow. Gates, 462 U.S. at 239. Cf. United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000) (agents' brief summary of the information obtained from wiretaps was sufficient).

But even if could be said that Agent Anderson was aware of untestified-to facts giving rise to probable cause at the time of the arrest, the Government has not shown a basis for imputing his knowledge to the officers who actually arrested the defendant. As noted above, Anderson did not ask or direct the officers to make the arrest, so the "vertical" collective knowledge doctrine does not apply. Nor does the evidence disclose a basis for pooling or attributing Anderson's knowledge to the arresting officers under the horizontal doctrine. That doctrine applies when a number of officers each has a piece of the probable cause puzzle, but no single officer has sufficient information. The inquiry then turns on "whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge." Whitley,

-18-

680 F.3d at 1234, n.3. While the officers involved here could all be viewed as part of the same investigative team, the evidence is both vague and conflicting as to what information was communicated among them. It does not show that Anderson's knowledge was shared or pooled with the arresting officers. Cf. United States v. Edwards, 885 F.2d 377, 382 (7th Cir. 1989) ("A supervising officer's knowledge about a defendant cannot be relied upon to provide probable cause for his arrest where there is no evidence that such knowledge was communicated to the agents on the scene who actually made or ordered the defendant's arrest.").

In sum, the evidence fails to show that the warrantless arrest of the defendant on April 8, 2008 was justified by probable cause at its inception. Moreover, because the evidence fails to show that Agent Anderson or others had probable cause to arrest the defendant when they dealt with him at the DEA office, the defendant's continued detention at that time was likewise unlawful. Cf. New York v. Harris, 495 U.S. 14 (1990) (where police had probable cause to arrest defendant but made unlawful entry into home to arrest him, defendant could not claim that his continued custody thereafter at the police station was unlawful; the fact that officers had probable cause to arrest rendered defendant's custody at the station lawful).

While not bearing directly on the legality of the defendant's detention, the court notes that Michelle Lindgren was also detained, if not arrested, in the total absence of any reasonable justification for that action. The evidence shows she was detained from the time of officers' initial entry into the house until sometime in the evening hours of April 8th. A reasonable person in her circumstances – one

taken at gunpoint, handcuffed and transported from her home to the DEA office and back for a search – would not have felt free to leave or disregard the agents' requests until agents told her late that evening that she was free to go if she wanted. No evidence was presented at the hearing to suggest that at the time of her detention officers had any factual basis to reasonably suspect Michelle Lindgren of committing any offense.

**C. Consent for search given at the DEA office**. Voluntary consent to search is an exception to the warrant requirement. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). Where the validity of a search rests on consent, the Government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983). The Fourth Amendment requires that "a consent not be coerced, by explicit or implicit means, by implied threat or covert force." <u>Schneckloth</u>, 412 U.S. at 228. Whether a consent to a search was voluntary is a question of fact to be determined from the totality of all the circumstances.

Some of the relevant factors in determining voluntariness include: physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his Miranda rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances. <u>United States v. Jones</u>, ___F.3d___, 2012 WL 6582319,

*15 (10th Cir., Dec. 18, 2012) (citations omitted).

Taking into account the totality of the circumstances, the court finds the defendant in fact voluntarily consented to a search of his residence. The defendant signed a consent-to-search form while he was in custody at the DEA office. The consent granted via that form was unequivocal and specific. The evidence shows there was no physical mistreatment of the defendant, no use of violence, and no threats in connection with his granting of consent. He was in custody at the time – unlawful custody at that – which weighs against a finding of voluntariness – but the fact of custody alone does not preclude a voluntary consent.[11] Jones, 2012 WL 6582319, *15. The defendant's wife was also in custody and had been transported to the DEA office with no legal justification. The fact that fact too weighs against a finding that defendant's consent was voluntary.[12] Finally, agents had already entered and swept through the Lindgren house before consent was requested. Despite these considerations, the court finds they are outweighed here by other factors shown by the evidence, including the defendant's high level of intelligence, his prior experience with law enforcement, the fact that he fully understood his rights (including the Miranda rights he was administered and knowingly waived), and his clear and expressed willingness to cooperate. This last factor –

[11] As noted below, recent case law draws a distinction between the factual question of voluntariness and the question of whether a consent or other evidence has been tainted or arrived at by exploitation of an unlawful search or seizure.

[12] The evidence failed to show that Michelle Lindgren's consent to search the house was given freely and voluntarily. In view of the court's ruling below that defendant's consent was tainted, the court need not address the legal significance, if any, of a lack of consent to search the house by Mrs. Lindgren.

defendant's ready willingness to deal with the DEA agents – is particularly strong and significant here. The court concludes that defendant's will and capacity for self-determination were not overcome or critically impaired by the agents' conduct. Taken as a whole, the evidence shows defendant's consent to search was in fact freely and voluntarily given.

Defendant nevertheless argues that any consent was tainted by the officers' prior unlawful conduct. As the Tenth Circuit has explained:

> When a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that there was "a break in the causal connection between the illegality and the evidence thereby obtained." United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir.1994) (internal citations, quotation, and footnote omitted). "Although the two requirements will often overlap to a considerable degree, they address separate constitutional values and they are not always coterminous." Id. at 1054. "We require the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because we are concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule."

United States v. Fox, 600 F.3d 1253, 1257 (10th Cir. 2010). The critical question insofar as the exclusionary rule is concerned is whether the evidence objected to has been obtained through exploitation of the unlawful conduct or instead was obtained by means sufficiently distinguishable to be "purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). See also Florida v. Royer, 460 U.S. 491,

Whether the taint of an illegal search or seizure has been

severed or dissipated is analyzed under the factors in <u>Brown v. Illinois</u>, 422 U.S. 590 (1975): 1) the temporal proximity between the police illegality and the consent to search ; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct. <u>Melendez-Garcia</u>, 28 F.3d at 1054.

After considering the Brown factors, the court must conclude the Government has not met its "heavy burden" (<u>United States v. Fox</u>, 600 F.3d 1253, 1259 (10th Cir. 2010)) of showing a sufficient break in the causal connection between the illegal seizure of the defendant and his granting of consent to search.

The evidence shows defendant gave consent within an hour or so of being unlawfully seized. He was in custody the entire time from the initial seizure until he gave consent. <u>Cf</u>. <u>Brown v. Illinois</u>, 422 U.S. at 604 (statement suppressed where it was separated from unlawful arrest by less then two hours); <u>United States v. Fox</u>, 600 F.3d 1253, 1260 (10th Cir. 2010). The first Brown factor weighs against any finding that the taint was dissipated.

The second Brown factor examines whether there were any intervening circumstances. Examples that tend to sever the connection between illegal conduct and the discovery of evidence include carefully explaining a consent form and advising an individual of the right to withhold consent, release from custody, an appearance before a magistrate, or consultation with an attorney. <u>Fox</u>, 600 F.3d at 1261.

The only claim of intervening circumstance here is the Government's assertion that defendant was given and waived his Miranda rights, and perhaps also that the consent form was clearly explained

to him. While the giving of Miranda rights is an important consideration, under these circumstances it is not enough to sever the causal connection between the illegal seizure of the defendant and his consent. See Kaupp v. Texas, 538 U.S. 626, 633 (2003) (State's reliance upon the giving of Miranda warnings was not sufficient to purge taint); Taylor v. Alabama, 457 U.S. 687 (1982) (taint of illegal arrest was not dissipated by circumstances, including giving of Miranda warnings); Brown v. Illinois, 422 U.S. at 603 ("Miranda warnings, alone and per se, cannot always ... break, for Fourth Amendment purposes, the causal connection between the illegality and [a] confession.").

As these Supreme Court cases suggest, merely informing the defendant of his rights without any other event to mitigate the impact of an unlawful arrest and detention is unlikely to qualify as an intervening circumstance. Brown, 422 U.S. at 602 ("If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted."). Similarly, the fact that the consent form was explained to defendant under these circumstances does not demonstrate a significant break from the unlawful detention.

The last Brown factor examines the "purpose and flagrancy" of the illegal conduct. Such misconduct may be found where: 1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and 2) the misconduct was investigatory in design and purpose and executed "in the hope that something may

turn up." <u>Fox</u>, 600 F.3d at 1261. The agents here seized the defendant's wife at gunpoint, entered the couples' residence and went through each room of the house, and detained Michelle Lindgren in her home, all without any constitutional basis. They then seized defendant at gunpoint without probable cause and in apparent disregard of instructions to simply approach defendant and get his cooperation. The defendant and his wife were then transported from their home to the DEA office for questioning although the record discloses no justification, legal or otherwise, for doing so. Events thereafter took a more orderly turn as the case agents became directly involved. The agents informed defendant of his rights, obtained a purported consent to search and, when defendant showed hesitancy, the agents properly halted the search and sought a warrant from a judge.

Agent Anderson testified there "were a lot of cooks" in this operation and the way it unfolded seems proof of the adage that "too many cooks spoil the broth." More than any purposeful unlawful conduct, the record suggests a severe breakdown in communication between members of the investigative team. At least some members of the "entry team" mistakenly believed they were there to raid the Lindgren residence and to secure it against possible destruction of evidence. Given the absence of any objective justification for the officers' actions, the third Brown factor weighs toward a finding that defendant's consent to search the house was tainted by the unlawful conduct. The admitted purpose of detaining defendant in the first place was to get his consent for a search. Like <u>Brown v. Illinois</u>, the officers' actions here suggest an investigatory purpose and "give[] the appearance of having been calculated to cause surprise, fright,

and confusion." 422 U.S. at 605. Defendant's consent to search was ultimately a product of those unlawful actions of the officers, and the need to deter such conduct warrants exclusion of any evidence found solely by reason of the defendant's consent to search. <u>Florida v. Royer</u>, 460 U.S. 491, 501 (1983) ("statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will").

**D. Defendant's waiver of Miranda rights and his resulting statements**. The court reaches a similar conclusion with respect to defendant's waiver of Miranda rights and the admissibility of his statements to agents Heim and Anderson on the evening of April 8, 2012. <u>See</u> <u>United States v. Torres-Castro</u>, 470 F.3d 992, 1001 (10th Cir. 2006) (noting post-arrest statements are subject to same exclusionary rule analysis). The totality of circumstances shows that defendant understood his rights and made a knowing and voluntary choice to waive his rights and speak to the agents, notwithstanding the fact that he and his wife were unlawfully detained at the time of the waiver and for at least some portion of the time he was making statements.[13] But an assessment of the Brown factors likewise leads to the conclusion that his statements were tainted by the unlawful conduct. Like consent, the waiver of Miranda rights came shortly after defendant's initial seizure while defendant and his wife were unlawfully detained at the DEA office and it is properly viewed as a

---

[13] Once the agents obtained the search warrant, they likely had the authority to detain the occupants of the house while they executed the warrant. <u>Michigan v. Summers</u>, 452 U.S. 692 (1981).

product of that detention. It is true the statements he gave to the agents occurred after he was transported back to his home, which could be viewed as lessening any coercive aspects of the detention, but the waiver and the ensuing statements were nevertheless a product of the unlawful detention of the defendant and his wife. Defendant remained in unlawful custody during at least some portion of the interview and no significant break in the chain of circumstances has been shown. And as noted above, the evidence suggests the agents' unlawful actions, including the forcible manner of arrest and transporting defendant to the DEA, had an investigatory purpose and were designed to surprise or confuse defendant and thereby obtain information from him, rather than to secure his voluntary cooperation.

**E. Search Warrant**. Defendant challenges the judicial search warrant agents obtained for the Lindgren residence and the officers' reliance upon it. Doc. 102 at 13-16; Doc. 86 at 3..

In this instance, the court need not add to the length of this opinion by analyzing whether or not the Magistrate had the required "substantial basis" for finding probable cause,[14] because even without such a basis, the agents' reliance upon the warrant was objectively reasonable and meets the "good faith exception" of <u>Leon v. United States</u>, 468 U.S. 897 (1984).

In <u>Leon</u>, the Supreme Court held that the exclusionary rule should not be applied to evidence obtained by officers who reasonably

---

[14] Because of the strong preference for searches conducted pursuant to a judicial warrant, a reviewing court pays "great deference" to the issuing magistrate's determination of probable cause and reviews only to ensure that the magistrate had a substantial basis for the finding. <u>Illinois v. Gates</u>, 462 U.S. 213, 236 (1983).

rely on a warrant issued by a neutral and detached magistrate, even if the warrant is later found invalid. The exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Leon, 468 U.S. at 916. The rule would have little deterrent effect where an officer acts in objective good faith and obtains a search warrant from a judge or magistrate. It is the magistrate's responsibility to determine whether the allegations establish probable cause and, if so, to issue a warrant. The agent cannot ordinarily be expected to question the magistrate's determination or his judgment that the warrant is sufficient. Leon, 468 U.S. at 921.

A warrant issued by a magistrate thus usually suffices to establish that a law enforcement officer has acted in good faith in conducting the search. Leon, 468 U.S. at 922. The Supreme Court has identified four circumstances where that is not so, and where an officer's reliance on a warrant will not be considered objectively reasonable: (1) where the judge was misled by information in an affidavit that the affiant knew was false (or would have known but for a reckless disregard of the truth); (2) where the judge wholly abandoned his neutral and detached judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient – such as by failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid. Leon, 468 U.S. at 923.

There is no allegation or evidence here of falsity in Agent

Brantley's affidavit or of abandonment of the judicial role. Nor is the warrant facially invalid for lack detail as to the place to be searched or the things to be seized. With respect to third <u>Leon</u> exception – an asserted lack of probable cause – defendant ably identifies several shortcomings in the affidavit, including a number of references to general and unexplained "beliefs" of an unidentified "SOI" (source of information). But reliance on a warrant is "entirely unreasonable" only if the affidavit is "devoid of factual support." <u>United States v. Henderson</u>, 595 F.3d 1198, 1202 (10th Cir. 2010).

The affidavit includes various facts that can reasonably be considered as establishing a fair probability that contraband or evidence of a crime would be found in defendant's residence. For example, the affidavit cites fairly detailed information from one SOI about defendant's mortgage business and his storage of allegedly fraudulent mortgage records, which provided some factual basis for inferring first-hand knowledge of the criminal activity alleged by the SOI between defendant and James Elledge. <u>See</u> <u>United States v. Hendrix</u>, 664 F.3d 1334, 1338 (10th Cir. 2011) ("An informant's tip which provides 'highly specific or personal details from which one could reasonably infer that the informant had firsthand knowledge about the claimed criminal activity' is more likely to be found sufficient to support probable cause."). These inferences of knowledge were bolstered by allegations that the source obtained information from a current employee of defendant's business and by allegations that the source accurately identified known associates of defendant and was able to provide their correct phone numbers. It was further bolstered, the affidavit suggests, by the interview of an unnamed suspected co-

conspirator who stated that defendant was the "brains" behind this operation and that defendant maintained detailed financial records in a file cabinet at his house. A further nexus between the alleged mortgage fraud and defendant's residence was shown, according to the affidavit, by wire intercepts and by common business practices.

The affidavit's statement that agents "have interviewed [the]" SOI reasonably suggested the agents met in person with the source and knew or could easily have determined his identity, which is recognized as a factor tending to support reliability of the information provided. See United States v. Jenkins, 313 F.3d 549, 554 (10th Cir. 2002) (fact that police could determine tipster's identity provides a disincentive to give false information). The affidavit also recounted a wiretapped phone call between defendant and James Elledge in which the two were discussing a disputed real estate transaction and Elledge said, "I got enough paperwork here to put me in jail." This can reasonably be viewed as providing some independent corroboration of the SOI's claim that defendant and Elledge were engaging in mortgage fraud.

The source further alleged that defendant and Elledge were involved in the distribution of drugs, including ecstacy, marijuana and cocaine. The affidavit shows that agents verified that defendant and Elledge were the subject of a 2003 drug investigation. It also contained information tending to independently corroborate the source's allegation of marijuana trafficking. It recounts a wiretapped phone conversation in which defendant asked an individual to buy 4 x 8 foot pieces of PVC pipe, and asserts that "the quantities, measurements and connectors" requested by defendant "are consistent

with that of an indoor, hydroponic marijuana grow." This latter assertion is a matter within the specialized knowledge of law enforcement agents familiar with drug trafficking. Nothing in the affidavit or circumstances set forth casts doubt on the credibility of the assertion.[15] The purchase of such items may appear entirely innocuous to a lay person, but a magistrate is entitled to credit such expertise in assessing probable cause. The allegation provides a further basis for concluding that this warrant was not so lacking in probable cause as to render official belief in its existence it unreasonable.

The affidavit is certainly not a model of detail or clarity, but neither is it a "bare bones" application without any supporting facts. "When we consider whether the officer relied in good faith upon a warrant, we must look to the underlying documents to see whether they are devoid of factual support, not merely whether the facts they contain are legally sufficient." United States v. Gutierrez, 2012 WL 4748158, *4 (10th Cir., Oct. 5, 2012)(quoting United States v. Cardall, 773 F.3d 1128, 1133 (10th Cir. 1985)). The Government has met its burden of showing reasonable reliance on the warrant in this case. A reasonable officer could have believed the warrant to be a valid order supported by probable cause. United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000) (affidavit based on informant tip failed to show probable cause but was not so lacking that the officer should

---

[15] The affidavit further asserted that a search warrant executed at 8406 W. Palmetto on April 8, 2008, revealed an indoor marijuana grow that was consistent with the foregoing phone call. But the affidavit failed to explain any connection between the defendant and the Palmetto residence.

have known the search was illegal despite the magistrate's authorization). As such, evidence found solely as a result of the agents' execution of the search warrant is not subject to exclusion.

**F. Evidence subject to exclusion**. Under the evidence presented and the foregoing findings, the court concludes that defendant's motion to suppress must be granted as to evidence of any statements made by defendant to officers on April 8, 2008, including the post-Miranda interview at his residence by Agents Anderson and Heim. Those statements were a product of and were tainted by the unlawful detention of the defendant.

Defendant's consent to search was likewise tainted by his unlawful detention. The court will grant the motion to suppress as to any items of evidence found in defendant's residence as a direct or indirect result of the search conducted pursuant to consent. This includes any testimony from officers about items observed during the consensual search.

As indicated above, the exclusionary rule prohibits the introduction of evidence seized during, or as a result of, an unlawful or tainted search. See Murray v. United States, 487 U.S. 533, 536-37 (1988). Under the "independent source doctrine," however, evidence is admissible if it has been discovered by means wholly independent of any constitutional violation. Nix v. Williams, 467 U.S. 431, 443 (1984).

The evidence shows that the search warrant obtained on the Lindgren residence was in no way a product of or tainted by the agents' prior unlawful actions. None of the information included in the warrant application was derived from the unlawful actions of the

officers. <u>Cf</u>. <u>Segura v. United States</u>, 468 U.S. 796, 816 (1984)
(illegal entry into apartment did not contribute in any way to
discovery of the evidence seized under the warrant). Thus, pursuant
to the independent source doctrine and <u>Leon</u>, the evidence that was
obtained in good faith reliance on that warrant is not subject to
exclusion.

The evidence concerning what items were found during the
consensual search as opposed to the search under the warrant is not
clear. The only items in the house the court can say with confidence
were found after issuance of the search warrant was the information
contained within defendant's mortgage and financial files. The
evidence as a whole, including Agent Brasser's testimony about the
limited time and scope of the consensual search, reasonably supports
a finding that agents searched through the information in the files
only after issuance of the search warrant. Accordingly, the motion to
suppress will be granted as to all physical evidence found in the
search of the residence except for the files taken from defendant's
home office.

**G. Inevitable discovery**. The Government relies upon the
inevitable discovery doctrine to argue that <u>all</u> of the items found in
the house should be admissible because agents inevitably would have
obtained a search warrant and located those items. The evidence shows
that the agents initially decided not to seek a search warrant and
instead planned to get defendant's voluntary consent for a search. The
reason for that decision – whether due to a lack of confidence in
probable cause or for some other reason – is not clear from the
evidence. At any rate, the fact that agents perhaps <u>could</u> <u>have</u> sought

and obtained a search warrant instead of choosing this other course is not enough to establish inevitable discovery.

No substantial step toward obtaining a warrant was undertaken prior to the agents' unlawful actions. <u>Cf</u>. <u>United States v. Cunningham</u>, 413 F.3d 1199, 1204 (10th Cir. 2005) ("The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for [defendant's residence] as soon as possible," which they would have done but for arrival of defendant's mother at the residence); <u>United States v. Cabassa</u>, 62 F.3d 470, 473(2nd Cir. 1995) (the extent to which the warrant process has been completed is important factor in evitable discovery claim). Nor has the Government shown that at the time of the unlawful search agents had the type of "overwhelming" or "extremely strong" probable cause that would have made obtaining a warrant anything approaching a certainty. <u>Cf</u>. <u>United States v. Souza</u>, 223 F.3d 1197, 1204 (10th Cir. 2000). It is true that agents were subsequently able to get a warrant, but the evidence fails to establish the "high level of confidence" necessary to show that procuring the warrant was an inevitable event. <u>Souza</u>, 223 F.3d at 1205.

**III. Conclusion**.

Defendant's Motions to Suppress Statements (Docs. 85 & 99) are GRANTED;

Defendant's Motions to Suppress Search (Docs. 86 & 101) are GRANTED IN PART and DENIED IN PART as set forth above;

Defendant's Motion to Suppress Wiretap Evidence (Doc. 104) and Motion for a <u>James</u> hearing (Doc. 105) were orally withdrawn and are DENIED as moot;

Defendant's Motion in Limine (Doc. 103) is also DENIED as moot in view of the Government's representations that it would not seek to use the challenged Rule 404(b) evidence in its case-in-chief; and

The Government's Motion for Continuance (Doc. 106) was previously GRANTED by the court.

This case is hereby set for jury trial beginning <u>February 12, 2013, at 9:00 a.m.</u>

IT IS SO ORDERED.

Dated this <u>11th</u> day of January 2013, at Wichita, Kansas.

<u>s/Monti Belot</u>

Monti L. Belot

UNITED STATES DISTRICT JUDGE